E-FILED
Friday, 14 July, 2017  02:58:42 PM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

JASON DALLEFELD,

    Plaintiff,

    v.

THE CLUBS AT RIVER CITY, INC.,

    Defendant.

Case No. 1:15-cv-01244-JES-JEH

## ORDER AND OPINION

Now before the Court is the Defendant, The Clubs At River City, Inc.'s, Motion for Summary Judgment. Doc. 22. The Plaintiff also moves to strike paragraphs of the Supplemental Declaration of Lisbeth Robinson. Doc. 27. This matter is fully briefed, and for the reasons set forth below, the Motion for Summary Judgment is DENIED.

### Background

The Plaintiff, Jason Dallefeld ("Dallefeld"), worked for the Defendant, The Clubs at River City, Inc. ("The Clubs"), since November 2012. He became a full time employee in March 2013. Doc. 1, p. 2. Dallefeld was the Director of Membership Sales and his duties included giving tours, selling memberships, keeping an eye on The Clubs and making sure other employees showed up for work. Dallefeld reported to Lisbeth "Lizzy" Robinson and Dan O'Connell at The Clubs. Robinson is the business manager at The Clubs, and handled FMLA leave for employees. O'Connell is the President of The Clubs. Relevant to the case at hand, Dallefeld's employment with The Clubs was terminated in June 2014.

Before his employment at The Clubs, the Plaintiff injured his right knee in 2009 at his previous job.[1] Dallefeld first consulted Dr. Blair Rhode for his knee issues in July 2012. Dallefeld continued to see Dr. Rhode until January 2015. Doc. 25-2, p. 3. Dr. Rhode suggested surgery. Dr. Rhode testified that Dallefeld could not afford the surgery or the time away from work to recover from the surgery. Dallefeld informed O'Connell and Robinson about his knee injury. Dallefeld sometimes walked with a limp at his job.

*1. Workers' Compensation Claims*

Dallefeld filed workers' compensation claims through counsel on March 12, 2014. The Defendant was notified about these claims for the four injuries he alleged were work-related. Robinson testified that she was "perplexed" when she received notification of his workers' compensation claims and O'Connell testified that he was upset that Dallefeld filed these through counsel.

*2. Work Status Reports*

Prior to his termination in June 2014, the Plaintiff suffered injuries to his knee while at work in September 2013, January 2014, February 2014, and March 2014, resulting in a right lateral meniscus tear. According to Dallefeld, he discussed these incidents with Robinson and sometimes O'Connell. O'Connell's file of First Reports of Injury include Dallefeld's first reports on injury for September 2013, January 2014, February 2014, and March 2014.[2] In September 2013, Dallefeld was injured at work due to slipping on a water collecting mat that was placed on tiled floor. He injured his knee again at work the following January and February, although he

---

[1] Dallefeld was injured while working at Five Star Fitness and filed a workers' compensation claim. Dallefeld's workers' compensation benefits claim was still pending against Five Star Fitness, where he originally injured his right knee, when he was deposed. Doc. 25-1, p. 8.
[2] Defendant does not dispute this, but see 25-4, p. 10. It is unclear whether Dallefeld gave these to either O'Connell or Robinson, but Robinson had access to the files to turn into the workers' compensation insurance. *Id.*

did not miss work. On March 5, 2014, he injured his right knee again while descending stairs. For this accident, Robinson retrieved ice for his knee, the knee was swollen, and he had to elevate it. The Plaintiff reported these injuries as work-related injuries. (See Doc. 26, p. 6; Doc. 25-4, p. 9).

Dallefeld did not miss work after these incidents and remained on full duty until the March 2014 injury. The worst injury, according to the Plaintiff, was the March 2014 injury. Although disputed by the Dallefeld, the Defendant maintains that Dallefeld continued to lift weights at The Clubs after his injuries, even the March 2014 injury. On March 12, Dr. Rhode initially kept Dallefeld on full duty, but on March 26, placed him off duty. Dallefeld worked between March 12 and March 26. The parties dispute whether or not Dallefeld requested to be taken off duty and the reasons why Dr. Rhode took him off full duty. Doc. 25-1, p.13. Dr. Rhode testified that the March injury aggravated Dallefeld's symptoms. The Defendant does not dispute that after this injury, Dallefeld "had a hard time moving around, could not use the bathroom comfortably and was laid upon the couch." Doc. 25, p. 5.

Dr. Rhode gave Dallefeld return-to-work-slips or work status reports that provided a work status of light duty, full duty, or modified duty. Dr. Rhode maintained Dallefeld on full duty from July 25, 2012 until he was put off duty on March 26, 2014. When Dallefeld was placed off duty on March 26, the planned return to fully duty was six to eight weeks after operation. Robinson acknowledges that she was given a copy of the off duty report. According to Dallefeld, his knee was swollen, he was limping, and he was not able to walk. On April 1, 2014, Dallefeld left for Florida with his then-girlfriend and others. He disputes how much he drove on the trip.

Robinson asked Dallefeld to come back to work, and according to Dallefeld's testimony, The Clubs' attorney told Dallefeld's workers' compensation attorney that The Clubs will follow his light duty if he could obtain that. Robinson was filling in for him at work. At some point, Robinson asked him if he could give tours, sit at his desk, and answer the phone. Dallefeld was put on modified duty by Dr. Rhode on May 21, 2014, after Dallefeld spoke with Robinson about coming back to work. Dr. Rhode gave him a lifting limit. In explaining to Dr. Rhode that he could return to work if he had modified duty, Dallefeld told Dr. Rhode that he could sit at his desk and prop his leg up. According to Dallefeld, he went to Robinson, who handled the employee requests for FMLA leave, with the new modified duty slip and she seemed happy, but O'Connell had to approve his return to work. At that time, O'Connell was out of the state. Robinson and Dallefeld both testified that after O'Connell's return, O'Connell seemed to avoid Dallefeld to discuss returning to work. Doc. 25-1, p. 15-16.

A few days after Dallefeld texted O'Connell to ask if he could come back to work, all three met on June 2, 2014 for a meeting. At the meeting, Robinson and O'Connell were both present, and O'Connell told Dallefeld to "go have the surgery."[3] O'Connell testified that he never received the May 2014 work status report that Dallefeld could go on light duty. Doc. 25-4, p. 11. Although his termination was not discussed at the meeting, O'Connell sent a termination letter with a June 1, 2014 date.[4]  Doc. 25-11.

O'Connell testified that neither Dallefeld's decision to file a workers' compensation claim nor his hiring a lawyer to file the claim played a role in the decision to terminated his employment. Dallefeld was not terminated for disciplinary or performance reasons, and no

---

[3] For context, Dallefeld testified that O'Connell stated the following: "And he said, Oh, go ahead and have the surgery. We have it covered. We have a couple employees taking care of it, you know. Everybody is working together, I guess, to cover it until you get done. Get the surgery, and we'll take care of it." Doc. 25-1, p. 19.
[4] As aside note, on May 25, 2014, Dallefeld applied for unemployment insurance benefits.

4

written disciplinary actions were taken against him during his employment with the Defendant. When asked about why Dallefeld was let go, O'Connell testified to the following:

> His inability to be specific when his knee was going to be done, and we – he'd gone and had a number of knee operations – knee examinations, and we could never really get a straight answer what was going on from him.

Doc. 25-4, p. 9; O'Connell Dep at 93, ¶ 12-16.

Dr. Rhode placed Dallefeld off duty on June 4, 2014. In August 2014, after his surgery, he was placed on modified light duty—with a lifting restriction—with planned full duty set at four weeks.

*3. FMLA Leave*

During the relevant time periods, The Clubs offered family and medical leave to its employees. The parties dispute whether Dallefeld requested leave under the Family and Medical Leave Act (FMLA) pursuant to The Clubs' policy. The parties also dispute whether The Clubs permitted written and oral requests for medical leave. According to The Clubs' policy:

1. A *Request for FLMA [sic] Leave of Absence* form must be completed by the employee requesting leave and submitted to the Human Resource office 30 days before commencement date. If 30 days' notice is not possible, notice of a request for FMLA leave must be given as soon as possible.

2. When the leave is due to any employee or family member's serious health condition, the employee must provide Human Resources with a *Certification of Serious Health Condition* form completed by the healthcare provider.

3. While on leave, employees may be asked to obtain re-certification of the medical condition and the continuing need for FMLA leave.

4. When the leave is for planned medical treatment, the employee must attempt to schedule the treatment so as not to disrupt the company's operations.

Dallefeld had been in meetings in which the FMLA policy was discussed. Dallefeld testified that he never received an Employee Handbook when he worked at The Clubs and never read it. Doc. 25-1, p. 16. He testified that he was present at meetings where it was discussed. He

testified that he understood that he was to give them notice but did not know exactly how FMLA leave worked, and didn't know there would be forms to sign. *Id.*, p. 17.

Dallefeld remembers talking about FMLA leave with Robinson, but "there was never like an actual topic of discussion at length. We talked about it, and then she's like get back to work or let's get you on light-duty." Doc. 25-1, p. 17. When asked if he remembered asking Robinson or O'Connell about FMLA leave, he answered:

> A. No, I can't tell you yes or no on that. We discussed it. I don't know if I brought it up or not because, you know, Lizzy [Robinson] is really by the book. So, I mean, if it was something that – you know, I couldn't tell you.
>
> Q. Do you remember dates of any such conversations?
>
> A. No. It wasn't a concern at that point, you know, it was –
>
> Q. Do you remember discussing how Family and Medical Leave Act works? Was that what the conversations were about?
>
> A. No. I think it was just kind of an under – I mean, Lizzy was kind of like the HR lady, so she knew the rules of it. I mean, she would direct me if I needed to do something that I – you know, other than giving her the paperwork, I mean, if she needed something, she would let me know.

*Id.*

Robinson testified that the FMLA leave requests should be in writing, but the individual can request it any way they want. Doc. 25-3, p. 6-7. Specifically, when asked how an employee requests leave, Robinson testified that: "It should be written, but they can request it however they care to request it, and I would complete the paperwork for them and get the process started." *Id.*

O'Connell testified that Dallefeld would have had to ask Robinson about FMLA leave because she had the paperwork. Doc. 25-3, p. 11. Robinson also testified that Dallefeld would have been eligible for FMLA leave when he brought her the March 2014 off-duty slip. Robinson Dep. at 113; Doc. 25-3, p. 14. The Defendant does not dispute that Plaintiff was released to modified duty in May 2014; however, the Defendant contends that this is immaterial, Dallefeld

did not request FMLA leave, Dallefeld had no legal right to return to light duty during FMLA leave, and Dallefeld was shortly thereafter taken off work by his doctor. Doc. 25, p. 7.

*4.  Accommodation*

The parties also dispute whether Dallefeld requested a reasonable accommodation under the ADA. Dallefeld claims that he was incapacitated from March 26, 2014 through May 21, 2014, which is more than three consecutive calendar days; the Defendant disputes this. The Defendant does not dispute that the Plaintiff's right knee injury was a physical impairment and physical disability during Dr. Rhode's treatment. Doc. 26, p. 9.  Text messages sent from Dallefeld to O'Connell show that Dallefeld attempted to talk to him about returning to modified duty. Doc. 25-7. The Defendant does not dispute that Dallefeld was able to perform his job without limitation until Dr. Rhode took him off work on March 26, 2014 and does not dispute that the Plaintiff was released to modified duty in May 2014. (Doc. 26, p. 7).

*5.  Procedural History*

On June 15, 2015, the Plaintiff filed a Complaint, bringing claims under the Family and Medical Leave Act (FMLA); Title I of the Americans with Disabilities Act (ADA) 42 U.S.C. § 12111; and Illinois common law retaliatory discharge, 820 ILCS § 305/1. (Doc. 1). Specifically, the Plaintiff alleges that the Defendant interfered with his rights under the FMLA and the Defendant retaliated against the Plaintiff for trying to exercise his FMLA rights; the Plaintiff qualified as an individual with a physical disability within meaning of the ADA, and the Defendant unlawfully refused him a reasonable accommodation and discharged him because of his disability in violation of the ADA; and finally, the Defendant discharged the Plaintiff in retaliation for exercising his rights under the Illinois Workers' Compensation Act.

On March 14, 2017, the Defendant filed the instant Motion for Summary Judgment. The Defendant argues that Dallefeld cannot establish a violation of the FMLA, cannot establish his ADA claims, and cannot establish his claim of common law retaliatory discharge. The Plaintiff opposes the Motion, and maintains that there are genuine issues of material act in this case relating to his request for leave and a reasonable accommodation, as well as factual questions regarding the reason for his termination. This order follows.[5]

### Standard of Review

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A material fact is one that might affect the outcome of the suit.  *Insola v. Philip Morris, Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000).  The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show there is a genuine issue of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita*, 475 U.S. at 588.  Any disputed issues of fact are resolved against the moving party. *GE v. Joiner*, 552 U.S. 136, 143 (1997).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  *Celotex Corp.*, 477 U.S.

---

[5] The Court reminds parties to review Local Rule 7.1(D) governing Motions for Summary Judgment prior to submitting their briefs. In particular, facts should be numbered and citations should indicate exact locations of facts and quotations in the record.

at 323.  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the

pleadings and produce evidence of a genuine issue for trial.  *Id*. at 324.  Where a proposed

statement of fact is supported by the record and not adequately rebutted, a court will accept that

statement as true for purposes of summary judgment; an adequate rebuttal requires a citation to

specific support in the record.  *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th

Cir. 1998).  This Court must then determine whether there is a need for trial—whether, in other

words, there are any genuine issues that properly can be resolved only by a finder of fact because

they may be reasonably resolved in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250 (1986).

## Analysis

*1.  FMLA*

The FMLA entitles eligible employees to twelve work-weeks of unpaid leave during any

twelve month period for serious health conditions. 29 U.S.C. § 2612(a)(l). Under the statute,

employers are prohibited from interference with, restraint of, or denial of the exercise or attempt

to exercise an employee's right to take leave, and the statute gives employees a cause of action if

such interference occurs. 29 U.S.C. §§ 2615(a)(l) & 2617.  The FMLA also provides a remedy in

the event that an employee is discriminated against for having exercised his rights under the Act.

29 U.S.C. § 2615(a)(l) & (2).

To maintain this cause of action, a plaintiff must show: (1) he was eligible for protection

under the FMLA; (2) he was covered by the FMLA; (3) he was entitled to leave under the

FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) the employer denied

him leave to which he was entitled.  *Ridings v. Riverside Medical Center*, 537 F.3d 755, 761 (7th

Cir. 2008). Where an employee alleges that her employer deprived her of the FMLA's

substantive guarantees, "the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave . . . the intent of the employer is immaterial." *King v. Preferred Technology Group*, 166 F.3d 887, 891 (7th Cir. 1999).

a. *Violation of FMLA*

In Robinson's deposition, she concedes that Dallefeld was eligible for FMLA and The Clubs was covered by the FMLA. Next, the Plaintiff must show that he was entitled to leave under the FMLA. An employee is entitled to FMLA leave if he suffers from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A serious health condition may be one that involves "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). In order to meet this definition, the health condition must include a period of incapacity of more than three consecutive, full calendar days and any subsequent treatment or period of incapacity relating to the condition. 29 C.F.R. § 825.115(a).

There is evidence in the record that the Plaintiff was treated by Dr. Rhode after his injury during March 26, 2014 through May 21, 2014. The Plaintiff maintains that the March knee injury "took [him] out" during this time and he could not move around with his swollen knee. The Defendant disputes this because Dallefeld took a trip to Florida in April, and the Defendant argues he drove some of the trip. Also, the Defendant contends that Dallefeld continued to lift weights at The Clubs during this time period. Interestingly, the Defendant's Reply states: "it is far from clear that Dallefeld could not have done his job after March 26. (MSJ, Section D. pp. 4-5)." Doc. 26, p. 3. However, driving and lifting his arms does not definitively show that the Plaintiff could complete all of his job responsibilities, such as giving tours. Thus, there is a factual dispute as to Dallefeld was entitled to FMLA.

Next, an employee must provide sufficient notice of his intent to take FMLA leave. *Pagel v. TIN Inc.*, 695 F.3d 622, 628 (7th Cir. 2012). The FMLA's notice requirements "are not onerous" but rather require that the employee "provides information sufficient to show that he *likely* has an FMLA-qualifying condition." *Burnett v. LFW Inc.*, 472 F.3d 471, 478-79 (7th Cir. 2006) (emphasis in original). Emphasizing that "the employee can be completely ignorant of the benefits conferred by the Act," the Court stated that "[a]n employee need not expressly mention the FMLA in his leave request or otherwise invoke any of its provisions." *Id.*, quoting *Stoops v. One Call Commc'ns.*, 141 F.3d 309, 312 (7th Cir. 1998). Thus, notice inquiry is "fact-rich" and "perhaps best resolved by the trier of fact." *Pagel*, 695 F.3d at 628 (citations omitted).

Dallefeld argues that he provided information to The Clubs sufficient to show that he likely has an FMLA-qualifying condition. It is undisputed that Robinson received the off duty report from Dr. Rhode. Dallefeld testified that he remembered talking about FMLA leave with Robinson, but "there was never like an actual topic of discussion at length." Doc. 25-1, p. 17. When asked if he remembered asking Robinson or O'Connell about FMLA leave, he answered: "No, I can't tell you yes or no on that. We discussed it. I don't know if I brought it up or not because, you know, Lizzy [Robinson] is really by the book. So, I mean, if it was something that – you know, I couldn't tell you." *Id.*

The Defendant maintains that Dallefeld did not provide sufficient notice of his intent to take leave or provide The Clubs with 30 days advance notice pursuant to 29 C.F.R. § 825.302(a) and the company Employee Handbook. The Clubs' policy stated that the FMLA leave form "must be completed by the employee requested leave and submitted to the Human Resource office 30 days before commencement date. If 30 days' notice is not possible, notice of a request for FMLA leave must be given as soon as possible." Regarding notice, Robinson testified that:

"The general principle is that you give 30 days notice, but, again, it may or may not always be available." Doc. 25-3, p. 8. She stated that the notice requirement depends on the medical situation.

The Defendant also argues that since he had been trained on the FMLA, he should have known he had to request leave. Further, The Clubs argue that he had no right to be reinstated to light duty. According to Robinson, when asked if she had a medical file for Dallefeld, she answered: "The only thing I had regarding medical was the slip he gave me stating he would be off work, so at that point, yes." Doc. 25-3, p. 5. The Defendant also argues that Dallefeld's absence was open-ended. Doc. 26, p. 4.

It is unclear whether The Clubs would accept a verbal request for FMLA leave. Concerning FMLA requests, Robinson stated the following: "It should be written, but they can request it however they care to request it, and I would complete the paperwork for them and get the process started." Doc. 25-3, p. 6-7. The following exchange also took place:

> Q. Okay. Once an employee requests leave, either verbally or written, how long does it usually take for you to get back to them as whether they're eligible for leave or not?
>
> A. I wouldn't say there was a usual. I would say I would process the paperwork within a day or so.

Doc. 25-3, p. 7. Robinson did not clarify that verbal requests would not be accepted.

Robinson stated that only one employee requested FMLA leave at The Clubs. Doc. 25-3, p. 8. According to Robinson, that employee "sent her department head – her supervisor, I believe it was, an e-mail, which was then forwarded to me." *Id.* Defendant also concedes that a current employee, Ott, verbally requested time off, although the Defendant distinguishes her paid time off from FMLA leave. Robinson discussed other employees who had taken leave, including one

12

who had a doctor's note and requested time off for a back injury but did not take FMLA leave. Doc. 25-3, p. 9.

The Clubs knew Dallefeld would be taking some time off from work. Dallefeld told Robinson that he was going to have surgery, because he explained to her that he was getting surgery and his workers' compensation lawyer filed claims with The Clubs in order to move the workers' compensation process along. Doc. 25-3, p. 15. Robinson also testified that Dallefeld gave her a copy the March work status report, taking him off duty, by delivering it to her at her house. Doc. 25-3, p. 16. Dallefeld told her that his surgery was "imminent." Doc. 25-3, p. 17. However, Dallefeld left for Florida the day after being placed off duty, and did not schedule a surgery. Nor did he have surgery before May 21, 2014, when he sought to return.

In her testimony, Robinson states that she did not discuss FMLA leave with Dallefeld:

Q. And when you received this, the March Work Status Report, you knew that Jason was requesting time off of work then, correct?

A. I knew that he was going to be off work, correct.

Q. Did you discuss FMLA with Jason at that time?

A. No.

Q. Was Jason given any FMLA paperwork?

A. Jason never requested FMLA paperwork.

Q. And you never told Jason that he could not be off duty after he gave you the March 2014 Work Status Report, did you?

A. I never told him that he couldn't be off?

Q. Right.

A. I never told him that.

Doc. 25-3, p. 17.

On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the Plaintiff in this case. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). While Dallefeld presents minimal evidence

13

that he even gave thought to FMLA leave, when viewing the evidence in a light most favorable

to the Plaintiff, a sufficient amount of disputed fact exists regarding notice to survive summary

judgment.  A reasonable trier of fact could find that Dallefeld gave sufficient notice to the

Defendant that he would take leave from work when he provided the Defendant his doctor's

work status report taking him off duty. Since Robinson was in charge of FMLA leave, and she

received the note, a reasonable jury could find that she should have started the FMLA leave

process. See *Burnett v. LFW Inc.*, 472 F.3d 471, 478-79 (7th Cir. 2006) (the employee does not

need to explicitly request FMLA leave or know he has FMLA rights to qualify). As Dallefeld

testified, "I mean, she would direct me if I needed to do something that I – you know, other than

giving her the paperwork, I mean, if she needed something, she would let me know." Doc. 25-1,

p. 17.

Dallefeld did not complete The Clubs' FMLA leave form. Dallefeld does not remember

discussing taking FMLA leave, although he knew The Clubs' policies from meetings; if he was

not certain, he could have asked Robinson. The Clubs may very well be found to be within its

rights to enforce its own internal FMLA leave procedures. The employer may require employees

to comply with internal notice obligations:

> (e) Waiver of notice. An employer may waive employees' FMLA notice obligations
> or the employer's own internal rules on leave notice requirements. If an employer
> does not waive the employee's obligations under its internal leave rules, the
> employer may take appropriate action under its internal rules and procedures for
> failure to follow its usual and customary notification rules, absent unusual
> circumstances, as long as the actions are taken in a manner that does not
> discriminate against employees taking FMLA leave and the rules are not
> inconsistent with § 825.303(a).

29 C.F.R. § 825.304. See also, *Brown v. Auto. Components Holdings, LLC*, 622 F.3d 685 (7th

Cir. 2010). It is also true that "FMLA regulations specifically provide than an employer may

require employees to comply with the employer's usual and customary notice and procedural

requirements for requesting leave, absent unusual circumstances." *Brown v. Automotive Components Holdings, LLC*, 622 F.3d 685, 690 (7th Cir. 2010), quoting § 825.302(d) (internal quotations omitted). However, here, there circumstances could be found unusual. Robinson was aware that Dallefeld would be taking time off work for his knee issue. Therefore, she was not "in the dark" about his medical condition or his plans to return. *Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 971 (7th Cir. 2000). Nor was Dallefeld vague or mention only that he was contemplating taking leave. See *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015). Viewing the facts in a light favorable to the Plaintiff, Robinson's testimony that employees may "request it however they care to request it" creates a question of whether this notice requirement was waived, particularly when she knew he was taken off duty for his knee issue. Overall, the parties' conflicting evidence creates a genuine issue of material fact regarding notice.

Finally, Dallefeld argues that The Clubs denied him FMLA benefits and that he therefore meets the last element. Because the parties dispute whether or not the Defendant received Dallefeld's May 21, 2014 work status report allowing him to return to work, and because the Defendant fails to articulate a reason for Dallefeld's termination, the Defendant is not entitled to summary judgment. There is a question of whether the Defendant denied his FMLA leave when he was terminated while he was off duty.

b. *Retaliation claim*

Employers may not use "FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ." 29 C.F.R. § 825.220(c). According to the Defendant, Dallefeld cannot show a causal connection between his off work slip and his eventual termination, and timing is not enough to show causation.

In the past, courts determined whether a plaintiff could succeed in a discrimination or retaliation claim under either the direct or indirect method of proof. Recently, in *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit determined that "evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id*. Accordingly, the Court will look to the evidence in this case as a whole.

The Defendant argues that Dallefeld can only show that he suffered an adverse employment action, but he did not engage in statutorily protected activity where no FMLA rights were triggered. The Defendant also argues that his job was unique so he cannot establish that he was treated less favorable than a similarly situated employee. However, as previously stated, there is a dispute as to whether he triggered his FMLA rights. Second, whether his job is comparable to employees who took leave is a question of fact.

The Defendant argues Dallefeld cannot show a causal connection. Also, according to the Motion for Summary Judgment, The Clubs suspected that he obtained an off work slip in order to take a vacation in Florida. However, the timing of the termination is also consistent with Dallefeld's allegations. For instance, the Defendant accommodated Dallefeld for a few weeks and had other individuals fill in for him. When allegedly asked to return to modified duty at a meeting, he was subsequently terminated. Additionally, the termination letter predated the meeting, although his termination was not discussed at the meeting. Also, the Defendant was otherwise satisfied with his work.

The Court determines that there are significant questions of fact underlying the circumstances of the Plaintiff's termination that must be determined by the fact finder. For example, there is an issue of whether the Defendant fired Dallefeld to prevent him from

16

exercising his right to reinstatement. See *Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). Accordingly, the Defendant is not entitled to summary judgment on the FMLA claim.

*2.  ADA*

    *a.  Disability*

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . discharge . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. To defeat a motion for summary judgment on an ADA claim, the plaintiff must identify a genuine issue of material fact as to whether: (1) the plaintiff is disabled within the meaning of the ADA; (2) he is able to perform the essential functions of the job either with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. *Gogos v. AMS Mechanical Systems, Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013); *Kampier v. Emeritus Corp.*, 472 F.3d 930. 937 (7th Cir. 2007); *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005); *Majors v. General Electric Company*, 714 F.3d 527, 533 (7th Cir. 2013). Under the ADA, disability is defined as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2).

In the Motion for Summary Judgment, the Defendant argues that it is questionable whether the Plaintiff has a disability: "Initially, it is questionable whether Dallefeld was qualified individual with a disability because of the lifting restriction and inability to give tours, as well as the fact that he missed months of work because Rhode continued to give him off-work slips." Doc. 22, p. 12. The Plaintiff responds that he has set forth facts that show he was disabled under

17

the ADA. For example, Dr. Rhode opined that his right knee, lateral meniscus tear was a physical impairment and disability. The Plaintiff argues that he had trouble walking, bending, lifting, and standing; these are major life activities pursuant to the requirements of 29 C.F.R. § 1630.2. The Defendant disputes that his injury had this effect because he vacationed in Florida and lifted weights at The Clubs after his March 2014 injury. (Doc. 26, p. 9, ¶ 46).

First, the Plaintiff has presented facts that could lead to a finding that he was disabled under the ADA. The Parties do not dispute that the Defendant was aware of his knee injury, as both Robinson and O'Connell testified that they knew of the knee injury and doctor appointments during his employment. According to Dallefeld and Dr. Rhode, his knee injury significantly limited his ability to stand and walk at work. Moreover, the Plaintiff has a documented medical record of his knee issue, and the Defendant also concedes that during Dr. Rhode's treatment, Dallefeld's right knee injury was a physical impairment and physical disability. Doc. 26, p. 9, ¶¶ 44-45.

Second, Dallefeld has presented facts that he is able to perform the essential functions of the job either with or without reasonable accommodation. § 12111. His main duty was to sell and renew memberships. He was able to sit at his desk, use a computer, and take phone calls. The only duty he could not fulfill was to give tours around The Clubs. Robinson testified that other people at The Clubs are able to give tours if Jason was not able to. Robinson testified that Dallefeld would have been able to perform his duties on the light work modified duty as described in the May 2014 work status report by Dr. Rhode. Doc. 25-3, p. 18. The Defendant does not dispute that Dallefeld was able to perform his job without limitation until Dr. Rhode took him off work on March 26, 2014.

Finally, Dallefeld has presented facts that support the last element of an ADA claim, that he suffered an adverse employment action because of his disability. As discussed above, O'Connell testified that Dallefeld was let go because:

> His inability to be specific when his knee was going to be done, and we –he'd gone and had a number of knee operations- knee examinations, and we could never really get a straight answer what was going on from him.

Doc. 25-4, p. 9; O'Connell Dep. at 93, ¶ 12-16. The Defendant's reason for the termination is unclear. A reasonable fact finder could find that that The Clubs were entering a busy season, Dallefeld was uncertain when he would return, and his duties needed to be reassigned. However, Dallefeld has presented facts that could also lead a reasonable fact finder to determine that Dallefeld's employment was terminated because of his disability. He was going to be off of work for a few weeks if he had surgery in the future, he had filed workers' compensation claims with The Clubs, and asked for light duty so that he would not have to stand. He was fired soon after being taken off work and attempting to return with light duty. Thus, a genuine dispute of material facts exists as to whether Dallefeld suffered an adverse employment action because of his disability.

b. *Accommodation*

The ADA also provides that an employer discriminates by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).  A failure to accommodate claim arises only if the employee first satisfies the requirement of demonstrating that she suffers from a disability within the meaning of the statute. *Szmaj v. American Telephone & Telegraph Co.*, 291 F.3d 955, 956 (7th Cir. 2002) (holding that the ADA does not impose a duty of accommodation and that the duty of accommodation arises only if the employee is first determined to have a disability within

the meaning of the Act). The Seventh Circuit has defined the prima facie showing required of an ADA plaintiff for failure to accommodate as follows: (1) she was disabled; (2) the [employer] was aware of her disability; and (3) she was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position. *McPhaul v. Board of Commissioners of Madison County*, 226 F.3d 558, 566 (7th Cir. 2000), citing *Feldman v. American Memorial Life Ins. Co.,* 196 F.3d 783, 789 (7th Cir. 1999).

Failure to accommodate a known disability can constitute discrimination under the ADA, unless doing so would impose an undue hardship on the employer. 42 U.S.C. § 12112(a), (b)(5)(A). Once an employer becomes aware of an employee's disability, it must make good faith efforts to reach a reasonable accommodation. *Beck v. University of Wisconsin Board of Regents,* 75 F.3d 1130, 1135 (7th Cir. 1996); *Hendricks-Robinson v. Excel Corp*., 154 F.3d 685, 693 (7th Cir. 1998). That being said, employers are not required to provide the precise accommodation requested by an employee, particularly where the employee's request is not adequately substantiated by medical documentation; the employer is only required to provide an accommodation that is reasonable in terms of costs and benefits. *Mays v. Principi*, 301 F.3d 866, 871-72 (7th Cir. 2002); *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998) (noting that an employee is not entitled to the best or employee-preferred accommodations, only an accommodation that is reasonable).

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment decision. *Buie v. Quad/Graphics, Inc*., 366 F.3d 496, 503 (7th Cir. 2004). If this is done, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason was merely a pretext for intentional discrimination or retaliation. *Id.* Pretext can be shown by

evidence suggesting that the proffered reason was factually baseless, was not the actual

motivation, or was insufficient to motivate the employer's action. *Grube v. Lau Industries, Inc*.,

257 F.3d 723, 729 (7th Cir. 2001).

Dallefeld alleges that The Clubs denied him a reasonable accommodation. In addition to

the evidence that he could return on modified duty, Dallefeld offers evidence that similarly

situated employees were treated differently. For example, he points out that Luke Burton, the

Defendant's current Manager on Duty and Membership sales employee, works on modified duty

with a weight restriction. Doc. 25-3, p. 8, 11.  The Defendant argues that this is immaterial and

Burton is not comparable because he was not the Director of Membership Sales.

According to the Defendant, it is undisputed that Dallefeld never asked for an

accommodation, but rather, unlimited time off. The Defendant quotes the portion of Dallefeld's

affidavit where he states that he never asked for anything other than coming back to light duty.

> Q. For any of the injuries you had at The Clubs at River City, did you ask for
>    anything special to change your job or anything like that other than coming
>    back to light-duty that you've talked about?
>
> A. No. Just my position was pretty easy. I mean, labor intensive it wasn't. So I
>    mean it was a pretty light-back job. So I've been in labor positions before and
>    it's hard work, so this was nothing to me.

Doc. 25-1, p. 23-24. The Defendant argues that even if the off work could be construed as a

request for reasonable accommodation, it was an open-ended request for time off for a surgery

that was not yet scheduled. The Defendant argues that this is not a reasonable accommodation.

Instead, The Clubs argue they have put forth a legitimate non-discriminatory reason for

his termination; that his duties needed to be reassigned to two existing employees as they entered

into a busy season. The Plaintiff disputes this because he claims that January is the busiest

season. However, O'Connell testified that January is one of the busiest seasons, not that it was

the only busy season. Doc. 25-4, p. 7. Moreover, the time of the year is not material to the ADA analysis.

Dallefeld has presented evidence that he requested an accommodation. In the May 21, 2014 Work Status form completed by Dr. Rhode, Dallefeld was released to light work modified duty; that is, he could not lift or carry more than 20lbs, and he was limited to frequent lifting of 10lbs or less. Doc. 25-10, p. 9. Dr. Rhode also testified that Dallefeld could have performed his job duties if given an accommodation where he did not have to walk around the club and give tours. However, the Defendant contends that while this is undisputed, "Dallefeld did not request an accommodation until allegedly returning with a light duty slip. O'Connell and Robinson had covered Dallefeld's position and expected Dallefeld's surgery to be imminent." Doc. 26, p. 10.

Again, Dallefeld testified that he could perform the essential functions of his job, such as sitting at his desk, answering the phone, and using his computer. He testified that he discussed this with Robinson. Robinson testified that other people at The Clubs are able to give tours if Jason was not able to, and she thought that Dallefeld would have been able to perform his duties on the light work modified duty. Doc. 25-3, p. 18. After meeting with O'Connell and Robinson, he was told to go have surgery, and he received a termination letter not long after that. The date of the termination letter was the day before the meeting in which he told O'Connell and Robinson that he could return to light work modified duty. However, Robinson testified that she did not recall whether Dallefeld verbally requested to come back to work on light-duty. Doc. 25-3, p. 19.

The Court determines that there is a dispute as to what Robinson knew about the May 2014 release allowing Dallefeld to work. The fact finder may very well determine that this work status from Dr. Rhode constituted a request for an accommodation, and that this was a

reasonable accommodation. When asked about the termination at her deposition, Robinson

testified that "[O'Connell] assumed he was coming in with a release, but he did not, so

[Dallefeld] basically stated that he could come back to work but his surgery was going to be

happening again any day." Doc. 25-3, p. 18. Robinson testified that O'Connell told Dallefeld to

bring the paper—which the Court assumes means the modified duty slip—but that Dallefeld did

not do so. Doc. 25-3, p. 18. It is disputed whether or not The Clubs even saw this form.

Accordingly, the Defendant is not entitled to summary judgment on the ADA claim.

*3. Retaliatory Discharge*

Lastly, the Clubs also argue that Dallefeld does not have a claim for common law

retaliatory discharge. In Illinois, retaliatory discharge claims have been allowed when an

employee files a Workers Compensation claim. *Michael v. Precision Alliance Group LLC*, 21

N.E.3d 1183, 1188 (Ill. 2014). A prima facie case requires a showing that: "(1) the employer

discharged the employee, (2) the discharge was in retaliation for the employee's activities

(causation), and (3) the discharge violates a clear mandate of public policy."  *Id.*

According to the Illinois Supreme Court, "once a plaintiff establishes a prima facie case

against the defendant, the defendant has the burden of rebutting the prima facie case with

evidence of a legitimate, nonretaliatory reason for discharging the plaintiff." *Clemons,* 184 Ill.

2d at 338 (1998).  Furthermore, "[i]f the defendant meets this burden, the plaintiff must then

prove that the nonretaliatory reason asserted by the employer is pretextual."  *Id*. "The issue of an

employer's true motive in terminating an employee is a question of fact, not normally subject to

summary judgment." *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 568, 900 N.E.2d

353, 359 (2008).

At issue is whether there is causation between the Plaintiff's exercise of his workers' compensation rights and his discharge. The Clubs submitted Dallefeld's claims to their workers' compensation insurance carrier. There is no evidence, argues the Defendant, that would allow a reasonable jury to conclude that his exercise of filing workers' compensation rights were the cause of his termination. The Defendant argues that the claims were turned in late and implies that Dallefeld may have done this to prevent his lawful termination from employment.

However, Dallefeld has presented evidence that he could return to work with restrictions after being injured at work, but the Defendant told him to go have surgery. The Plaintiff argues that a reasonable jury could find that the Plaintiff was discharged because he filed the workers' compensation claims. Robinson stated that she was "perplexed" and O'Connell stated that he was upset that Dallefeld filed the claims through counsel. Dallefeld claims that he gave The Clubs his work status report where he could return to work, but this was obviously denied when he was terminated. The Plaintiff contends that he was let go three months after he filed workers' compensation claims. This evidence, taken together, is enough for the retaliatory discharge claim to survive summary judgement. As a reasonable fact-finder could conclude that Dallefeld has created a genuine issue of material fact on this issue and made a credible showing that the Defendant terminated his employment because he exercised his workers' compensation rights. The Defendant is not entitled to judgment as a matter of law on the retaliatory discharge claim.

*4. Motion to Strike*

The Plaintiff also moves to strike paragraphs of the Supplemental Declaration of Lisbeth Robinson. Doc. 27. Because the Motion for Summary Judgment is denied, the Court need not address the arguments presented by parties in the Motion to Strike. The statements contained in

the Supplemental Declaration do not change the Court's analysis. The Court would note that it did not consider statements which contradicted earlier testimony.

## Conclusion

For the reasons set forth above, questions of fact exist as to whether the Plaintiff provided the Defendant with notice of FMLA leave, whether his injury was sufficient to meet the requirements of the FMLA and ADA, how long he was injured, whether he requested an accommodation, and the reason for his termination. As such, these issues are appropriate for the finder of fact to resolve.

Accordingly, the Defendant's Motion for Summary Judgment [22] is respectfully denied.

Signed on this ___14___ day of _____July_____, 2017.

_s/ James E. Shadid_____
James E. Shadid
Chief United States District Judge